UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CAROL E. RUGGLES                                 CIVIL ACTION

VERSUS                                           NO:    14-1021

LONNIE GRECO, SHERIFF,                           UNITED STATES MAGISTRATE
PLAQUEMINES PARISH                               JUDGE KAREN WELLS ROBY

ORDER AND REASONS

Before the Court is a **Motion for Summary Judgment (R. Doc. 19)** filed by Defendant, Plaquemines Parish Sheriff Lonnie Greco ("Sheriff Greco"), seeking summary judgment pursuant to Federal Rule of Civil Procedure 56. Greco seeks to dismiss Plaintiff, Carol Ruggles's ("Ruggles") sexual harassment claim pursuant to Title VII, 42 U.S.C. § 2000e, *et seq*., 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[1] The motion is opposed.  *See* R. Doc. 21.  It was heard on the briefs on March 25, 2015.[2]

## I.    Background

This action arises out of the sexual relationship of a superior and a subordinate. Sheriff Greco of Plaquemines Parish had a sixteen month sexual relationship with Ruggles, a grant manager of the Plaquemines Parish Sheriff's Office ("PPSO"). Ruggles first met Sheriff Greco and his wife in 1986 when Ruggles began dating her husband, Keith Ruggles.[3] Sheriff Greco and Ruggles's husband were close friends and coworkers until Ruggles's husband passed away on

---

[1] *See* R. Doc. 19.

[2] *See* R. Doc. 23.

[3] *See* R. Doc. 19-4, at 6 (Ruggles Dep. 40:15-20, Nov. 25, 2014).

October 27, 2011, at which point Sheriff Greco promised his friend that he would take care of his family.[4]

The following month, in November 2011, Sheriff Greco was elected Sheriff of Plaquemines Parish and was officially sworn into office on July 1, 2012.[5] Sheriff Greco promised his deceased friend that Ruggles would have a position at the PPSO under his leadership and Ruggles joined Sheriff Greco's transition team as a volunteer beginning in April 2012.[6] Around the same time, Sheriff Greco and Ruggles began their consensual sexual relationship. In April 2012, Sheriff Greco and Ruggles went to Florida on a motorcycle trip with four other individuals for nine days.[7] According to Ruggles, it was during the trip that she succumbed to Sheriff Greco's sexual advances, although she did not feel forced to have sex with him.[8]

Two months following the motorcycle trip to Florida, Ruggles became an official employee of the PPSO on June 27, 2012 when she was placed on the payroll as a grant manager, under the direct supervision of Chief Deputy Monica Nicosia ("Nicosia").[9] At the time Ruggles was officially hired, she was hired under the leadership of the interim sheriff, Mike Lafrance. A few days later, however, Sheriff Greco took office on July 1, 2012.

Sheriff Greco's and Ruggles's sexual relationship continued from April 2012 until August 25, 2013, which included her transition from a volunteer on his transition team to an

---

[4] *See* R. Doc. 19-4, at 3, 7 (Ruggles Dep. 17:5-7; 45:13-16, Nov. 25, 2014).

[5] *See* R. Doc. 19-3, at 4 (Greco Dep. 26:1-2, Jan. 27, 2015).

[6] *See* R. Doc. 19-4, at 14 (Ruggles Dep. 65:17-19, Nov. 25, 2014).

[7] *See* R. Doc. 19-3, at 3 (Greco Dep. 25:8-15, Jan. 27, 2015); R. Doc. 19-4, at 11 (Ruggles Dep. 55:1-25, Nov. 25, 2014).

[8] *See* R. Doc. 19-4, at 12 (Ruggles Dep. 56:1-13, Nov. 25, 2014).

[9] *See* R. Doc. 19-4, at 14 (Ruggles Dep. 65:19-21, Nov. 25, 2014).

employee under his leadership as sheriff. During the course of their relationship, the two sent sexually explicit text messages and videos to one another.[10] According to Ruggles, Sheriff Greco would sometimes "badger" her to make videos or meet him to have sex.[11] Nonetheless, there were reciprocal text messages expressing their love and lust for one another with each making sexual advances:

January 10, 2013:[12]

Sheriff Greco: Hey did you go buy yourself that elephant trunk to play with tonight. On my way back home from dinner with Mr. Ray I will call you to meet at your office if you want.

May 3, 2013:[13]

Ruggles: Show u what
Sheriff Greco: You said you were horny
Ruggles: I am. And I want u
Sheriff Greco: Fuck the shit out of your toy and video it

July 18, 2013:[14]

Ruggles: I want your tongue in my mouth
Sheriff Greco: We can make that happen. What else you want in your mouth
Ruggles: Whatever u want to put in it

July 27, 2013:[15]

Ruggles: So tired. Come get me
Sheriff Greco: K
Sheriff Greco: Why dont you go to sleep
Ruggles: NO. I want to be with u-/she'll never know…..please

---

[10] *See generally* R. Doc. 19-4, at 62-80; R. Doc. 19-5, at 1-30; R. Doc. 19-6, at 1-30; R. Doc. 19-7, at 1-15; R. Doc. 19-8, at 1-9.

[11] *See* R. Doc. 19-4, at 9 (Ruggles Dep. 50:1-3, Nov. 25, 2014).

[12] R. Doc. 21-8 (Text Messages, Jan. 10, 2013).

[13] R. Doc. 21-5 (Text Messages, May 3, 2013).

[14] R. Doc. 19-7, at 3 (Text Messages, July 18, 2013).

[15] R. Doc. 19-5, at 25 (Text Messages, July 27, 2013).

July 31, 2013:[16]

Ruggles: Love u my king kong
Sheriff Greco: Love u 2
Ruggles: When can I see u

August 19, 2013:[17]

Ruggles: Getting in bath tub now…I'll think of you as I soap it up real good and slow
Sheriff Greco: Oh
Ruggles: Yea. And I miss u so much

Undated:[18]

Sheriff Greco: What do you think
Ruggles: About what
Sheriff Greco: About me cracking the backside
Sheriff Greco: Got my dick hard think about that

Undated:[19]

Sheriff Greco: Use that burnt up vibrator and video you fucking it
Ruggles:  I want it so damn bad I would, but I Threw it away…wish I had it now
Ruggles: I love sex

On August 2, 2013, in the midst of Sheriff Greco's relationship with Ruggles, Detective Aaron Verrette ("Verrette") of the PPSO received an allegation from Ruggles's brother, William Cox, that Ruggles was doctor shopping for prescription drugs.[20] At the time, Ruggles's brother was being detained and interviewed for sexual misconduct with juveniles, including his daughter.[21] Ruggles assisted her niece in making the allegation against her father by driving her

---

[16] R. Doc. 19-5, at 19 (Text Messages, July 31, 2013).

[17] R. Doc. 19-4, at 73 (Text Messages, Aug. 19, 2013).

[18] R. Doc. 21-10 (Text Messages, Undated).

[19] R. Doc. 21-9 (Text Messages, Undated).

[20] *See* R. Doc. 19-8, at 10 (Search Warrant Application, Aug. 24, 2013).

[21] *Id.*

niece, who was then an adult, to the Sheriff's Office.[22] It is suggested that Ruggles's assistance to her niece may have been instrumental in provoking her brother to make the allegations against her during his interview with Verrette.

During the interview with Verrette, Ruggles's brother alleged that his sister had sent him text messages asking him to provide her with prescription pain medication and muscle relaxers.[23] Her brother alleged that she asked him to go to different doctors for her so that he can obtain additional pain medication prescriptions because she couldn't go back to her own doctor.[24] Ruggles became aware of her brother's doctor shopping allegations at some point following his interview with Verrette.[25]

On August 16, 2013, Agent Chris Barrios ("Barrios") received an anonymous complaint that Ruggles was doctor shopping.[26] Barrios shared the complaint with Chief Deputy Brian Boudreaux ("Boudreaux") and Boudreaux shared the complaint with Sheriff Greco, who told Boudreaux to investigate the allegations against Ruggles.[27] Boudreaux assigned Verrette and Captain Pelas to continue the investigation. On August 22, 2013, Verrette re-interviewed Ruggles's brother while he was being detained at Orleans Parish Prison. At that time, her brother gave Verrette permission to access his phone's text messages, which confirmed his previous allegation that she attempted to obtain pain medications illegally.[28]

---

[22] *See* R. Doc. 19-4, at 18 (Ruggles Dep. 107:18-25, Nov. 25, 2014).

[23] *See* R. Doc. 19-8, at 10 (Search Warrant Application, Aug. 24, 2013).

[24] *Id.*

[25] *See* R. Doc. 19-4, at 20 (Ruggles Dep. 112:2-20, Nov. 25, 2014).

[26] *See* R. Doc. 19-10, at 2 (Narcotics Investigation Report).

[27] *See* R. Doc. 19-11, at 2 (Boudreaux Dep. 14:1-25, Jan. 27, 2015).

[28] *See* R. Doc. 19-8, at 11 (Search Warrant Application, Aug. 24, 2013).

On Friday, August 23, 2013, the day after Verrette met with Ruggles's brother, Boudreaux decided to meet with Ruggles.[29] However, Ruggles was not at work that day.[30] Nicosia, Ruggles's supervisor, called Ruggles on August 23, 2013 and informed her that Boudreaux wanted to have a meeting with her but did not disclose the purpose of the meeting.[31] The next day, on Saturday, August 24, 2013, Verrette applied for a search warrant for any and all text messages, call logs, and emails contained in Ruggles's cell phone.[32]

On Sunday, August 25, 2013, the day after the search warrant was obtained, Ruggles went over to Sheriff Greco's home to visit with him and his wife.[33] Ruggles announced that she put her house up for sale because it was hard for her to be in the house without her husband and that she needed a fresh start.[34] At some point during the visit, Ruggles also informed Sheriff Greco that she "just can't do it anymore" and he allegedly responded, "You'll be back."[35] According to Ruggles, this exchange on the afternoon of August 25, 2013 is when she officially ended the relationship.

When Ruggles returned to work on Monday, August 26, 2013, she was asked to attend a meeting with Boudreaux, Verrette, Nicosia, and PPSO in-house counsel Frederick Yorsch ("Yorsch"). Sheriff Greco did not attend the meeting and he allegedly learned about the meeting that morning while driving to Baton Rouge to meet with Secretary LeBlanc of the Louisiana

---

[29] *See* R. Doc. 19-11, at 4 (Boudreaux Dep. 16:6-8, Jan. 27, 2015); R. Doc. 19-9, at 5 (Nicosia Dep. 14:2-5, Jan. 27, 2015).

[30] *See* R. Doc. 19-9, at 5 (Nicosia Dep. 14:4-18, Jan. 27, 2015).

[31] *Id.*

[32] *See* R. Doc. 19-8, at 10 (Search Warrant Application, Aug. 24, 2013).

[33] *See* R. Doc. 19-4, at 21 (Ruggles Dep. 118:8-25, Nov. 25, 2014).

[34] *Id.*

[35] *Id.* at 22 (Ruggles Dep. 120:6-7, Nov. 25, 2014).

Department of Corrections.[36] During the meeting, Yorsch asked Ruggles if she needed intervention through an employee assistance program, but she declined having a substance abuse problem[37] and refused any assistance.[38] After Ruggles refused assistance, Boudreaux asked her if she could pass a drug test but Ruggles evaded the question.[39] Boudreaux then instructed Verrette to, "Do what you gotta do" and Verrette grabbed Ruggles cell phone pursuant to the warrant.[40]

Concerned about her affair with Sheriff Greco being uncovered by the damaging text messages on her cell phone, Ruggles met privately with Yorsch and her supervisor Nicosia.[41] Ruggles disclosed during the private meeting that there were text messages on her phone that she didn't want publicized because they included sexually explicit messages between her and Sheriff Greco.  According to Ruggles, Yorsh told her to resign or be arrested and she resigned to protect Sheriff Greco and to protect herself.[42] Ruggles executed a resignation letter on August 26, 2013, that indicated that her resignation was immediately effective.[43]

The following day, Ruggles executed a second resignation letter under the direction of Sheriff Greco. Ruggles alleges that Sheriff Greco instructed her to meet him at his office that morning and during the meeting he was distraught over the 67,000 text messages and videos

---

[36] *See* R. Doc. 19-3, at 5 (Greco Dep. 56:2-14, Jan. 27, 2015).

[37] Ruggles continues to vehemently deny having a substance abuse problem and claims that if she had a problem it was due to Sheriff Greco facilitating her problem by bringing her medications on three different occasions, twice during their trip to Florida. *See* R. Doc. 19-4, at 25 (Ruggles Dep. 135:8-14, Nov. 25, 2014). However, Sheriff Greco denied obtaining prescription drugs for her and the case report generated by the State Police indicates that Ruggles went to eight different physicians and six different pharmacies within days of each other. *See* R. Doc. 19-12, at 3 (Office of State Police Case Report). The prescription drugs included Oxycodone, Guiatussin, Hydrocodone, and Lortab. *Id.* at 3-4. According to the report, Ruggles's illegal conduct occurred as early as April 2012 and as late as August 2013, the month she resigned. *Id.*

[38] *See* R. Doc. 19-4, at 25 (Ruggles Dep. 135:2-5, Nov. 25, 2014).

[39] *Id.* at 29 (Ruggles Dep. 139:13-23, Nov. 25, 2014).

[40] *Id.*

[41] *Id.* at 30 (Ruggles Dep. 140:3-19, Nov. 25, 2014).

[42] *Id.* at 31-32 (Ruggles Dep. 141:6-142:18, Nov. 25, 2014).

[43] R. Doc. 19-8, at 15 (Ruggles's Resignation Letter, Aug. 26, 2013).

found on her cell phone.[44] Ruggles alleges that he told her to resign and that she could work from home for two weeks to let the scandal die quietly.[45] Ruggles agreed and drafted the second resignation letter with an effective date of September 10, 2013.[46]

Two months later, Ruggles filed an EEOC charge on November 19, 2013 against Plaquemine's Parish Sheriff's Office alleging discrimination based on retaliation and sex.[47] Ruggles filed the subject action on May 4, 2014 alleging four causes of action: (1) sexual harassment in violation of Title VII, 42 U.S.C. § 2000e, *et seq*., 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; (2) retaliation for filing an EEOC complaint in violation of Title VII, 42 U.S.C. § 2000e, *et seq*.; (3) malicious prosecution in violation of the Fourth and Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983; and (4) malicious prosecution in violation of the laws of Louisiana.[48]

On March 27, 2015, Ruggles voluntarily dismissed all of her claims with the exception of her first cause of action for sexual harassment in violation of Title VII, 42 U.S.C. § 2000e, *et seq*., 42 U.S.C. § 1983, and the Equal Protection Clause. Under this cause of action, Ruggles's alleges that she had a sexual relationship with Sheriff Greco for approximately sixteen months and when she terminated the relationship, Sheriff Greco embarked upon a course of conduct to force her to resign, resulting in a "constructive" discharge.[49]

---

[44] *See* R. Doc. 19-4, at 37 (Ruggles Dep. 147:5-22, Nov. 25, 2014).

[45] *Id.*

[46] R. Doc. 19-8, at 16 (Ruggles's Resignation Letter, Aug. 27, 2013).

[47] R. Doc. 19-8, at 17 (EEOC Charge, Nov. 19, 2013).

[48] *See* R. Doc. 1, at 9-12.

[49] *See* R. Doc. 1, at 9

In response to Ruggles's complaint, Sheriff Greco filed the subject motion seeking dismissal of her claims. Sheriff Greco argues that he is entitled to summary judgment because Ruggles's claim is baseless under the facts of the case. Sheriff Greco contends that the doctor shopping investigation is unrelated to the termination of their relationship because it began weeks before the relationship ended on August 25, 2013.[50]

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure ("Rule") 56(a) provides that summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if resolving that fact in favor of one party could affect the outcome of the suit.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Poole v. City of Shreveport*, 691 F.3d 624, 626-27 (5th Cir. 2012).

Where the moving party bears the burden of proof at trial as the plaintiff, or as a defendant asserting an affirmative defense, that party must support its motion with "credible evidence . . . that would entitle it to directed verdict if not controverted at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S. Ct. 2548 (1986). In such a case the moving party must "establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see also Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011). Credible evidence may include depositions, documents, affidavits, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c). Moreover, in evaluating a motion for summary judgment by the party with the underlying burden of proof, the

---

[50] *See* R. Doc. 19-1, at 2.

Court considers the substantive evidentiary burden of proof that would apply at the trial on the merits. *Anderson*, 477 U.S. at 252. The moving party's burden is therefore "understandably heavier" where that party is the plaintiff. *S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.*, 829 F. Supp. 2d 437, 447 (E.D. La. 2011).

Once the moving party has made its showing, the burden shifts to the non-moving party to produce evidence that demonstrates the existence of a genuine issue of fact. *Engstrom v. First Nat. Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995) (citing *Celotex*, 477 U.S. at 322–24). All justifiable inferences are to be drawn in the non-moving party's favor. *Anderson*, 477 U.S. at 255. However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for Summary Judgment." *Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) (internal citations omitted); *see also Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (stating that "mere conclusory allegations" are insufficient to defeat a motion for summary judgment). Though the Court may not evaluate evidence on a motion for summary judgment, the Court may make a determination as to the "caliber or quantity" of evidence as part of its determination of whether sufficient evidence exists for the fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 254.

The summary judgment standard in an employment discrimination matter is premised upon a burden-shifting analysis from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. Thereunder, the Court must first determine if the plaintiff has established a prima facie case of discrimination, sufficient to raise an inference of discrimination. *McDonnell-Douglas*, 411 U.S. at 802; *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002) (finding that in Title VII actions, a prima facie standard is used for evidentiary purposes on summary

judgment); *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986) ("The McDonnell-Douglas formula . . . is applicable . . . in a . . . summary judgment situation.").

"Establishment of a prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see Turner v. Kansas City Southern Railway Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (citing *Burdine*, 450 U.S. 248). "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to different factual situations." *McDonnell*, 411 U.S. at 802 n.13. "There is no doubt that vague or conclusory allegations of discrimination or harassment are not enough to survive summary judgment." *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998).

## III.   Analysis

Ruggles argues that she had a sexual relationship with Sheriff Greco for sixteen months and when she decided to terminate the relationship, Sheriff Greco embarked upon a course of conduct designed to constructively discharge her by forcing her to resign.[51] Ruggles represents that she began her relationship with Sheriff Greco before he was sheriff and argues that he continued the relationship once he became sheriff despite her being his employee and the disparity in the power held between the two.[52] Ruggles alleges that the two had sex on public property in violation of PPSO policy and in violation of state law.[53] Ruggles admits that Sheriff Greco warned her of the doctor shopping investigation, but argues that no action was taken

---

[51] *See* R. Doc. 1, at 9.

[52] *See* R. Doc. 21, at 1-2.

[53] *Id.* at 6. Although Ruggles alleges they had sex on public property, no evidence was presented in direct support of this allegation.

against her until August 26, 2013, the day after she ended the relationship.[54] Ruggles further contends that she was subjected to a constructive discharge when she was told by Yorsch, PPSO in-house counsel, to "either resign or be arrested." Ruggles argues that after the affair was uncovered Sheriff Greco insisted that she resign and that she submitted a second resignation at his urging.[55]

Sheriff Greco contends that Ruggles was not forced to resign and that he did not pursue the investigation because she ended her relationship with him. Sheriff Greco argues that the events leading up to her resignation occurred before she ended their relationship.[56] Sheriff Greco represents that the PPSO received allegations of doctor shopping in early August, that the investigation began shortly thereafter, and that a search warrant was obtained on August 24, 2013, a day before the relationship ended on August 25, 2013. Sheriff Greco contends that the timing of the events does not support Ruggles's argument that she was constructively discharged on August 26, 2013 because she ended the relationship on August 25, 2013.

### A.   § 1983

Ruggles brings her claim under 42 U.S.C. § 1983, Title VII and the Equal Protection Clause of the Fourteenth Amendment. Under § 1983, to state a viable claim a plaintiff must "'(1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 165 (5th Cir. 2007) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994).

---

[54] *Id*. at 14.

[55] *Id.* at 7-8.

[56] *See* R. Doc. 19-1, at 2.

Sexual harassment of an employee by a public official constitutes sex discrimination in violation of the Equal Protection Clause and is actionable under § 1983. *Howard v. Town of Jonesville*, 935 F.Supp. 855, 859-60 (W.D. La. 1996). Although Ruggles's complaint does not explicitly allege that the Equal Protection Clause is the constitutional violation under § 1983 and treats the Equal Protection Clause and § 1983 as separate rights of action, the Court recognizes that a sexual harassment claim pursuant to § 1983 would in fact be an alleged violation of the Equal Protection Clause.

Furthermore, "plaintiffs suing their public employers for sexual harassment and sex discrimination [may] assert claims under both Title VII and section 1983." *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) (alteration added). The Fifth Circuit has held that "[s]ection 1983 and Title VII are 'parallel causes of action'" and that the "'inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII.'" *Lauderdale*, 512 F.3d at 166 (citing *Cervantez v. Bexar County Civil Serv. Comm'n*, 99 F.3d 730, 734 (5th Cir. 1996) and *Wallace v. Tex. Tech Univ*., 80 F.3d 1042, 1047 (5th Cir. 1996)). "Successfully meeting [the] requirements [under Title VII] would also establish a successful case under §§ 1981 and 1983." *Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir. 1986) (citing *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980)).

Based on the Fifth Circuit's treatment of Title VII and § 1983 as parallel causes of action for sexual harassment claims, the Court will conduct the same inquiry for Ruggles claims under § 1983 as it shall for Title VII.

### B.   <u>Title VII</u>

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). When assessing a sexual harassment claim under Title VII, the Court must first determine if the plaintiff has suffered a tangible employment action. *Casiano v. AT & T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000). If the plaintiff claims to have suffered a tangible employment action, then the plaintiff is asserting a *quid pro quo* harassment claim. However, if the plaintiff does not claim to have suffered a tangible employment action, the plaintiff is asserting at hostile work environment claim. *Id.* Here, Ruggles asserts that she is proceeding under the *quid pro quo* theory of harassment.[57]

After the plaintiff establishes that she suffered a tangible employment action, the Court must next determine if the plaintiff can establish a prima facie case of sexual harassment.  To make out a prima facie case of sexual harassment under the *quid pro quo* theory, a plaintiff must establish the following elements:

(1) she is a member of a protected group;

(2) she was subject to unwelcome sexual harassment;

(3) the complained-of harassment was based upon sex;

(4) that her reaction to the harassment affected tangible aspects of the terms and conditions of her employment, with her acceptance or rejection of the harassment being either an express or implied condition to receipt of a benefit to or the cause of a tangible adverse effect on the terms or conditions of her employment.

*Ellert v. Univ. of Texas, at Dallas*, 52 F.3d 543, 545 (5th Cir. 1995).

---

[57] *See* R. Doc. 21, at 11.

### C.    **Tangible Employment Action: Constructive Discharge**

Ruggles alleges that she suffered a tangible employment action when she was forced to resign from her position. According to Ruggles, she resigned for two reasons. Ruggles's primary reason was to avoid being arrested for doctor shopping because she was given the ultimatum of "either resign or be arrested."[58] Her secondary reason was to protect Sheriff Greco and to protect herself. However, Ruggles contends that the prospect of being arrested is so draconian that any reasonable person would have tendered their resignation and that under such circumstances the resignation can only be construed as a constructive discharge.[59]

Sheriff Greco contends that Ruggles cannot prove that she was constructively discharged because she cannot show a greater degree of harassment than is required for a hostile work environment claim.[60] Sheriff Greco avers that Ruggles has admitted that their sexual relationship was consensual and thus cannot establish that she was subjected to any type of hostile work environment. Additionally, Sheriff Greco argues that Ruggles was not constructively discharged because she admitted that she agreed to resign to protect Sheriff Greco and to protect herself.[61]

Under certain circumstance, a constructive discharged can qualify as a tangible employment action. *Williams v. Barnhill's Buffet Inc*., 290 F. App'x 759, 762 (5th Cir. 2008) (citing *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 480-81 (5th Cir. 2008)). When proceeding under a constructive discharge claim, an employee must offer evidenced demonstrating that the "'working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Aryain*, 534 F.3d at 480

---

[58] *See* R. Doc. 21, at 12.

[59] *Id.*

[60] *See* R. Doc. 19-1, at 17.

[61] *Id.* at 18.

(alteration in original) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342 (2004)). Additionally, a plaintiff must present "something more" than what is required to establish sexual harassment or hostile work environment claim. *Id.*

The Fifth Circuit has established six factors the Court should consider to aid in the constructive discharge inquiry:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*Hunt v. Rapides Healthcare Sys.*, LLC, 277 F.3d 757, 771–72 (5th Cir. 2001). In addition to these considerations, the Fifth Circuit has also found that a plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired. *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338-39 (5th Cir. 2014); *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). In *Faruki*, the Fifth Circuit found constructive discharge when an employer told the plaintiff that he should find another job because they would be unable to retain him and he had one week before he would be placed on indefinite unpaid leave. *Faruki*, 123 F.3d at 319.

Here, Ruggles's deposition testimony states that she was told by Yorsch to "either resign or be arrested." Yorsch's statement to Ruggles constitutes an ultimatum that affected a condition of her employment. While the ultimatum did not threaten termination, it threatened arrest and a reasonable person in Ruggles's position would have felt compelled to resign to avoid arrest. Taking Ruggles's testimony as true and considering the facts in the light most favorable to Ruggles as the non-moving party, the Court finds that the ultimatum constitutes a constructive

discharge and consequently a tangible employment action under the *quid pro quo* theory of harassment.

Having determined that Ruggles has established that she suffered a tangible employment action, the Court will proceed to the next step in the inquiry, which is whether Ruggles can establish a prima facie case of *quid pro quo* sexual harassment.

### D.        Prima Facie Case of *Quid Pro Quo* Sexual Harassment

As previously stated, to establish a *quid pro quo* sexual harassment claim, a plaintiff must satisfy the following four factors: (1) she is a member of a protected group; (2) she was subject to unwelcome sexual harassment; (3) the complained-of harassment was based upon sex; and (4) her acceptance or rejection of the harassment caused a tangible adverse effect on the terms or conditions of her employment. *See Ellert*, 52 F.3d at 545.

It is not disputed that, as a woman, Ruggles is a member of a protected group and satisfies the first element. As for the third element, which is whether the harassment was based on sex, the Fifth Circuit in *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 656-57 (5th Cir. 2002) (overruled on other grounds), found that harassment from a male supervisor after the termination of a consensual relationship was based on sex and not personal animosity after a failed relationship. Thus, Ruggles satisfies the third element because similar to the  plaintiff in *Green*, Ruggles claims that she was harassed after terminating her consensual relationship with Sheriff Greco.

Since the Court has determined that Ruggles satisfies the first and third elements of a *quid pro quo* sexual harassment claim, the remaining elements at issue are (a) was she subject to unwelcome sexual harassment; and (b) did her acceptance or rejection of the harassment cause the tangible adverse employment action.

The second element for a prima facie case under the *quid pro quo* theory "requires the plaintiff to produce some evidence that she was subject to unwelcome sexual harassment." *Blanchard v. Union Nat'l Life Ins. Co.*, No. 1:95CV218-D-D, 1996 WL 408069, at *6 (N.D. Miss. May 17, 1996). "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S. Ct. 2399 (1986). "'[U]nwelcome sexual harassment' is defined, in this circuit, as 'conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee.'" *Rodriguez v. City of Houston*, 250 F. Supp. 2d 691, 699 (S.D. Tex. 2003) (citing *Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986)).

In a consensual relationship with a supervisor, courts have found that a plaintiff can satisfy the "unwelcome harassment" element of the *quid pro quo* inquiry where following the termination of the consensual relationship the supervisor engages in conduct that is unwelcome. *See Green*, 284 F.3d 642 (finding sexual harassment based on sex where supervisor's conduct after the relationship was pervasive and severe); *Babcock v. Fran*k, 729 F. Supp. 279, 287 (S.D.N.Y. 1990) (finding that previous consensual sexual relationship with supervisor did not precluded Title VII claim where supervisor made unwelcome physical and verbal sexual advances).

If a plaintiff is able to prove unwelcome conduct, she must then prove that the tangible employment action occurred as a result of her refusal to submit to her supervisor's sexual demands. *See Price v. Danka Corp.*, No. CIV. 3:98-CV-2365-H, 2000 WL 274275, at *6 (N.D. Tex. Mar. 10, 2000). Thus, the plaintiff must prove a nexus between her acceptance or rejection of the harassment and the tangible employment action. *Id.*

Ruggles does not allege that her relationship with Sheriff Greco was unwelcomed and she admits that the relationship was consensual and that Sheriff Greco never threatened a condition of her employment on the continuance of their sexual relationship.[62] The Supreme Court has found that "voluntary" sexual activity doesn't preclude a sexual harassment claim and that the inquiry should not focus on the voluntariness of the plaintiff's activity but on whether the plaintiff's conduct indicates that the alleged sexual advances were unwelcomed. *Vinson*, 477 U.S. at 68.

In *Crutcher-Sanchez v. County of Dakota*, 687 F.3d 979 (2012), the Eighth Circuit considered a factually similar case where a subordinate engaged in voluntary sexual activity with her superior. The plaintiff presented deposition testimony that prior to their sexual relationship the defendant would look her up and down and would call her at work to tell her she looked good in her uniform. *Crutcher-Sanchez*, 687 F.3d at 983. The plaintiff also testified that on the first night they engaged in sexual intercourse she was intoxicated and protested because he was her boss. *Id.* Based on the evidence presented, the Eighth Circuit concluded that the plaintiff made a sufficient showing to demonstrate that a genuine issue of material fact exists as to whether she was subjected to unwelcome conduct. *See id.* at 985.

Here, Ruggles states in her deposition that the first time they engaged in sexual intercourse she succumbed to his sexual advances. When asked if it made her feel uncomfortable, she stated that she didn't know how it made her feel.[63] Ruggles also stated that Sheriff Greco "badgered" her on many occasions to meet him and to send videos.[64]

---

[62] *See* R. Doc. 19-4, at 8 (Ruggles Dep. 46:5-19, Nov. 25, 2014).

[63] *Id.* at 12 (Ruggles Dep. 56:2-10, Nov. 25, 2014).

[64] *Id.*

However, Ruggles did not provide any examples of Sheriff Greco badgering her and on no occasion does the record reflect that she had second thoughts about their relationship. Evidence of the text messages sent between Ruggles and Sheriff Greco indicate that both individuals initiated their sexual discourse and that it was well received by the recipient. In fact, there were no text messages from Ruggles in the record that imply she felt badgered or that his comments were subjectively unwelcomed. The text messages in the record indicate that from Ruggles's perspective the sexual banter was welcomed and desired. In addition to the sexually explicit text messages, the text messages in the record also demonstrate that Ruggles cared deeply for Sheriff Greco and that she was in the relationship by her own volition.

Ruggles additionally alleges in her opposition brief that she engaged in sexual activity with Sheriff Greco on public property in violation of state law and PPSO policy, but the evidence submitted to the Court does not support this allegation. Nonetheless, violation of the law and PPSO policy bears on a lack of ethics and morality, it does not bear on whether Ruggles perceived Sheriff Greco's sexual advances toward her as unwelcomed.

Furthermore, there is no evidence in the record that Ruggles endured unwelcomed sexual advances from Sheriff Greco after she terminated the relationship. From the pleadings, it appears that Ruggles's argument for satisfying the unwelcomed harassment element is that she believes Sheriff Greco moved forward with the investigation because she terminated the relationship. Ruggles stated in her deposition that she believed Sheriff Greco was instrumental in the meeting that resulted in her resignation because she was told by Yorsch that the sheriff knew about the meeting and she was told by an unidentified individual that Boudreaux was texting the sheriff the

entire time. Ruggles also stated that Sheriff Greco had the power to stop the investigation and that he previously covered up the wrongful conduct of another employee.[65]

Ruggles's allegation implicates the causation element as well as the unwelcome harassment element because whether the investigation proceeded due to her ending their relationship requires the Court to determine if there is a nexus between the two events. Thus, the issues before the Court are whether there is a material issue of fact as to whether Sheriff Greco was instrumental in the meeting on August 26, 2013 which led to Ruggles's resignation and whether the meeting occurred because she terminated their relationship.

After reviewing the evidence in the record, the Court finds that the timeline of events does not support the proposition that Sheriff Greco orchestrated the meeting on August 26, 2013 because she terminated their relationship. According to the warrant, the PPSO Investigation Report, and the State Police Case Report, the investigation began in early August after Ruggles's brother accused her of using him to obtain prescription drugs. On August 16, 2013, the PPSO received another complaint against Ruggles but this time from an anonymous source.   In response to the two complaints, Boudreaux reported the allegations to Sheriff Greco and he instructed Boudreaux to begin an investigation one week before the relationship was terminated on August 25, 2013.

When the investigation began in mid-August, Sheriff Greco and Ruggles were still in a consensual relationship and the text messages from that time period indicate that they were still seeing one another. While Sheriff Greco's initiation of the investigation may have been in poor taste or unethical given his relationship with Ruggles, Ruggles has not presented any evidence, and has not alleged, that he initiated the investigation due to their sexual relationship. Ruggles

---

[65] *Id.* at 41 (Ruggles Dep. 152:5-13, Nov. 25, 2014).

also testified that she did not tell anyone about their relationship and the record does not suggest that Boudreaux was aware of the relationship until Ruggles's phone was seized and searched.[66]

On August 22, 2013, a few days after the investigation began, Ruggles's brother was interviewed by Verrette and he consented to his cell phone being searched for messages implicating Ruggles. Upon finding incriminating messages from Ruggles, Boudreaux determined that it was time to meet with Ruggles.[67] Boudreaux testified that he originally set the meeting up for Friday, August 23, 2013, but Ruggles did not come to work.[68] Nicosia, Ruggles's supervisor, also confirmed that the meeting was scheduled for Friday, August 23, 2013 but Boudreaux had to reschedule the meeting for Monday because Ruggles was absent from work.[69]

Additionally, on Saturday, August 24, 2013, the day before she terminated the relationship with Sheriff Greco, a search warrant for her phone was obtained. Unbeknownst to Ruggles, all these events occurred before Sunday, August 25, 2013 when she officially terminated the relationship with Sheriff Greco by informing him that she was selling her house to get a fresh start and that she "just can't do it anymore." While Ruggles contends that the meeting was orchestrated as a result of her terminating the relationship, the evidence in the record indicates that the meeting was planned in advance of her terminating the relationship and the warrant was obtained the day before the relationship ended.

Therefore, Ruggles is not able to establish that there is genuine issue of material fact as to whether she was subjected to unwelcome harassment or that her rejection of Sheriff Greco

---

[66] *See* R. Doc. 19-11, at 5 (Boudreaux Dep. 31:1-7, Jan. 27, 2015). Boudreaux testified that after the phone was seized on August 26, 2013 he saw the messages between Ruggles and Sheriff Greco and determined that it would not be fair for the PPSO to continue the investigation, so he turned the case over to the state police.

[67] *Id*. at 3 (Boudreaux Dep. 15:11-16, Jan. 27, 2015).

[68] *Id*. at 4 (Boudreaux Dep. 16:6-11, Jan. 27, 2015).

[69] *See* R. Doc. 19-9, at 5 (Nicosia Dep. 14:2-5, Jan. 27, 2015).

caused her constructive discharge. It is well established that their relationship was consensual and she has presented no evidence of Sheriff Greco subjecting her to unwelcome conduct before or after she terminated the relationship. Additionally, evidence demonstrates that the meeting that led to her resignation was planned in advance of her ending the relationship and not as a result of the relationship terminating.

**IV.** **Conclusion**

Based on the foregoing,

**IT IS ORDERED** that Defendant's **Motion for Summary Judgment (R. Doc. 19)** is **GRANTED** and Ruggles's sexual harassment claim in violation of Title VII, 42 U.S.C. § 2000e, *et seq*., 42 U.S.C. § 1983, and the Equal Protection Clause are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this <u>7th</u> day of April 2015.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**